[No. 27972. Department One. June 22, 1940.]

THE STATE OF WASHINGTON, *Respondent*, v. JACK
MARABLE, *Appellant*.[1]

*Wallace G. Mills,* for appellant.

*Smith Troy* and *John S. Lynch, Jr.,* for respondent.

ROBINSON, J.—Jack Marable, alias Jack Harris, and
Robert Kimmich were convicted upon an information
containing three counts, the first charging kidnaping in
the first degree, as defined in chapter 6, Laws of 1933,
Ex. Ses., p. 8, Rem. Rev. Stat. (Sup.), § 2410-1 [P. C.
§ 8941-1]; the second and third counts charging rape,

[1]Reported in 103 P. (2d) 1082.

as defined in § 183, chapter 249, Laws of 1909, p. 942, Rem. Rev. Stat., § 2435 [P. C. § 9107]. The defendants were convicted on all three counts. The kidnaping statute reads, in part, as follows:

". . . and in every trial for kidnaping in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; . . ."

In this case, the jury returned a special verdict finding that the death penalty should be inflicted against Marable. He seasonably interposed a motion in arrest of judgment and for a new trial. This motion was denied, and he now appeals from the judgment and sentence of death.

The errors assigned relate wholly to alleged deficiencies in the instructions and with respect to the admission of evidence.

In our opinion, the alleged errors as to instructions present no real problem. Instructions 8 and 9 are complained of on the ground that they omitted the element of the crime of kidnaping, that the confinement or imprisonment must be secret. These two instructions were preliminary in their nature, instruction No. 8 being wholly devoted to defining the words "confined or imprisoned," and 9, to explaining their relation to other portions of the statute. The jury was amply informed of the fact that secrecy is an element of the crime in instructions Nos. 2, 5, and 10. We quote the whole of five and a portion of ten, omitting the name of the prosecuting witness and using italics to emphasize the point to be established:

"(5) The essential elements of the crime of kidnaping charged in the first count of the information, all of which the State must prove to the satisfaction of the jury beyond a reasonable doubt are that on or about the 3rd day of October, 1939, the defendants did wilfully, unlawfully and feloniously seize, confine and/or

inveigle [the prosecuting witness], by force and threats with intent to cause the said [prosecuting witness] without authority of law to be *secretly* confined or imprisoned, or to be held to service with intent to extort a reward for the release or disposition of the said [prosecuting witness]. Second, that said acts were committed in Thurston County, Washington."

"(10) . . . You are further advised as to the element of intent to kidnap necessary to be proven in this case, that the State must prove beyond a reasonable doubt that the defendants seized, confined or inveigled the said [prosecuting witness], without authority of law with the intent to *secretly* confine or imprison her, or, in the alternative, to hold her to service with the specific intent to obtain a reward for her release or disposition, such reward, however, not necessarily being of material or financial value."

The remaining questions presented by the appeal relate to the admission of evidence. It is contended that the trial court committed prejudicial error (1) in permitting the prosecuting witness to testify as to her poor condition of health prior to the date of the alleged kidnaping and rape; and (2), and especially, in that the court permitted the introduction of evidence as to the condition of her husband at the time the crimes were alleged to have been committed.

At about eight-thirty on the evening of October 3, 1939, the prosecuting witness, a twenty-two year old Olympia housewife, left the bedside of her critically ill husband at St. Peters hospital and drove to the postoffice to mail a letter, after which she intended to return to the care of her children, one of whom was three years old and the other but three months. As she got into her car after leaving the postoffice, and was about to drive away, a young man, Robert Kimmich, the joint defendant of appellant in this action, stepped up to the car window, brandishing a knife. There is conflict as to what he said. Her version is: "Do you see

this knife? If you scream, I will cut your damned heart out." His version is: "I asked her, I said, 'You see this,' and she said, 'Yes,' and I said, 'Well, go on and take me to Grand Mound out toward the airport.' " Kimmich, according to his own testimony, slid into the back seat, and Marable, at the same time, got into the front seat with the prosecuting witness and put his arm around her shoulders, keeping the other hand in the pocket of his jacket. Kimmich, according to the prosecuting witness, kept his hand on the back of her neck. According to his own testimony, he kept it on the seat just behind her head so that he could grab her quickly in case she made an outcry. They told her they were making a get-away and expected to meet another man south of the airport. They directed her to drive south on Capitol way, and she obeyed.

The young woman had seen an article in a newspaper a day or two before concerning the escape of some convicts, and, supposing that she had fallen into their clutches, began to cry. Marable roughly told her to "shut up," adding that he had no use for "damned crying women."

"Well, we drove on past the high school and I started pleading with them. I told them about my babies and how sick my husband was in the hospital, and I told them I would give them the car, told them they could have my ring and watch and money if they would just let me go to get back to the babies; and they said they wouldn't do anything to me, that they just wanted to meet this third person out by the airport, and if I did what they told me that they wouldn't hurt me."

Kimmich kept his hand on the back of her neck. When they arrived at the airport, Marable told her to keep on. They finally came to Tenino. It was raining very heavily, and the streets were deserted. It occurred to the young woman to drive into a gas station, but the younger man kept his hand on her neck, and

Marable warned her to drive straight on. Beyond Tenino, Marable told her that they would have to go under one railroad track and over another, and otherwise gave her particular directions. Finally, he ordered her to turn off on a side road. This did not prove to be the right road, and he ordered her back to the Pacific highway. Soon after, he directed her to turn into a graveled road. They drove on this for, perhaps, a half mile. Then he directed her to turn off into an unused and grass-grown road. Very shortly, they came to a group of three unoccupied and abandoned buildings. They ordered her to drive behind one of the buildings and stop the car. Warning her to make no noise, Marable took her by the shoulders, forced her out of the car, and shoved her along in front of him into an old shack of which part of the floor was gone. He forcibly removed her stockings and a portion of her underclothing, and assaulted her twice. Between these acts, he descended to the ultimate brute, inflicting upon the exposed portions of her body perversions of which no description can be decently given.

After satisfying his lust, Marable left the shack, telling her to remain there, and Kimmich immediately entered. Holding one hand in his pocket in a threatening manner, he commanded her to entirely disrobe, nor did he relent until she had removed, piece by piece, each and every garment to the very last stitch. He then assaulted her. She was left in such a weak and trembling condition that she was not able to dress herself. They turned her clothes inside out and helped her to put them on, and, when this had been accomplished, took her back to the car. They got in, and she drove it back to Olympia, the men occupying the same positions which they had occupied on the way out. They instructed her as to what she should say if they were stopped by the highway patrol or by the

police. They also asked her if she thought her mother would report her disappearance. She replied that her mother would probably think her husband's condition had grown worse, and that she had remained at the hospital. She hoped that upon this assurance they would let her drive all the way into Olympia, which they finally did. After warning her against telling what had happened, they ordered her to stop the car near the Governor hotel, and, when she did so, they got out and ran down toward the railroad tracks.

The police were called immediately. They found the shack before daylight, and on the floor a button which had been torn from the coat of the prosecuting witness. Certain other articles were found upon which later chemical analysis established the presence of human spermatazoa. Tracks were found about the shack, made by shoes with soles of a distinctive pattern.

Marable and Kimmich were arrested at about daybreak. The pattern on the soles of Kimmich's shoes corresponded with the pattern shown by the tracks about the shack. After a few days, he confessed his own part in the matter, declining, however, to make any statement as to Marable's acts at the shack. The confession was reduced to writing and given to Marable to read. There is evidence that, after reading it, he stated that his confession would be about the same. However, when his statement was recorded, he stoutly maintained that, after getting into the car, he remembered nothing whatever, except riding with some one through the rain, and that otherwise his mind was a complete blank from the moment he entered the car until he was awakened by the police at seven o'clock the next morning. This position he maintained throughout the trial.

The defense attempted to exclude the Kimmich con-

fession, on the usual and familiar ground that it was procured by police brutality, and, failing in this, relied, as to Kimmich, upon his extreme youth, he being but sixteen years of age, and, as to both defendants, upon the fact that they had been drinking bay rum, and, according to their own stories, had also been smoking marijuana cigarettes. As to the appellant Marable, his counsel said, in opening his defense, that he (Marable) would not deny an attack upon the prosecuting witness, but would accept her word for it because he was not sure what he had done. Continuing, his counsel said:

"But he is going to testify, and he is going to present evidence that at the time when he started drinking this bay rum and smoking this marijuana he had no intent to commit a crime of any kind, let alone rape or kidnaping; had no intent to commit any crime; and that then, after he had this stuff in him,—well, what happened, we will have to accept the state's word for that; that if he did this thing he was so drunk—he was too drunk to be able to entertain an intent to commit a crime."

That the defendants had been drinking bay rum at intervals for several days prior to the incident above recited, was amply proven. However, the prosecuting witness stated that, while she smelled some kind of liquor on their breaths, they did not talk thickly or stagger, and were not intoxicated. It was shown also that they had been stopped by two Olympia police officers at about seven-thirty that evening. The officers detected the smell of bay rum on Kimmich, but testified that neither of the men was drunk at that time. They were seen by the postmaster loitering about the postoffice between seven and seven-thirty. He regarded them as suspicious characters, and kept them under close observation for some time. It did not occur to him that they were intoxicated. At about the same time, a resident of Olympia, who had given Kimmich

food and clothing a day or two before, passed by, saw both men, and nothing about their actions indicated to him that they were intoxicated. Certainly, the testimony of the prosecuting witness that it was Marable who directed her where to drive, where to turn off, and what road she was to take, must be true, for he was familiar with that locality, while Kimmich had never been there or over that road.

Conviction of a number of serious crimes were shown to affect Marable's credibility. He was convicted of burglary in Alabama in 1920; of a theft of government property at Atlanta, Georgia, in 1924; of robbery in the state of Florida in 1926; of the violation of the Harrison narcotic act in 1928; of burglary in Alabama in 1931, and again in 1938.

After the event, and viewing the case in retrospect, it appears that there never was a chance for any other verdict than that of guilty on all counts. But, at the beginning of the trial and while putting in his case, the prosecuting attorney must have realized that he was faced with serious problems, especially as to the rape counts. There were no actual witnesses to the alleged criminal acts other than the prosecuting witness and the two defendants. The defendants might possibly succeed in excluding the Kimmich confession and refuse to take the stand themselves; hence, it was very important to corroborate the story of the prosecuting witness in every possible way.

There was an even greater problem. Upon a charge of rape, if consent appears, however reluctant it may be, there can be no conviction, and consent may sometimes be inferred if there has been no outcry and no serious resistance. The prosecuting witness in this case had made no outcry, and her resistance was only passive. It was necessary to convince the jury that

the lack of resistance on her part was due to weakness and fear.

In his opening statement, the prosecuting attorney announced that he would show, among other things, that, just prior to the commission of the crimes charged, the prosecuting witness had been ill with the "flu." Objections were at once taken by the defendants upon the ground that such evidence would be irrelevant and prejudicial. The objection was overruled. The prosecutor then added that he would further show that, at the time the crimes were committed, the husband had just undergone an operation for appendicitis and was in a very critical condition; this, as bearing upon the physical and mental state of the prosecuting witness at the time. No objection to this was then taken.

During the trial and over the objection of the appellant, evidence was introduced as per the opening statement. It was very brief; a simple matter-of-fact statement by the prosecuting witness that she had been ill about two weeks before, a later confirmation of that testimony by her physician, and still later in the trial, testimony by the same physician that her husband had been operated upon for appendicitis on October 1st or 2nd, and was in a critical condition, due to the fact that he had tonsilitis at the time and there was danger that pneumonia might ensue, and there was confirmation by the husband that he was ill in the hospital, as stated. The whole of this class of evidence, including the necessary introductory statements of the witnesses, the objections of counsel, and the rulings thereon, comprise eight pages of the eight hundred pages which record the evidence given at the trial. That there was no attempt to inflame the jury, and the matter-of-fact way in which this evidence was adduced, may be illustrated by quoting the testimony elicited from the hus-

band. After the identification of the witness, his examination proceeded as follows:

"Q. Directing your attention to the date of October 3rd, where were you at that time? A. In St. Peters hospital. Q. What was the cause of you being in the hospital? MR. MILLS: I object to that question for the same reason, that it is immaterial and prejudicial and has no bearing upon the case. THE COURT: The objection will be overruled and an exception allowed. A. I had an appendicitis operation. MR. TROY: Q. Now, on October 3rd—directing your attention to the evening of October 3rd, did you have a visit from your wife? A. Yes, I did. Q. What time did she arrive there, if you remember? A. Shortly after seven o'clock, I believe. Q. Do you know what time she left? A. I would say about eight-thirty. Q. Did she bring you anything that night, any package or object? A. Yes, she did. Q. What? A. Kleenex, a box of Kleenex. MR. TROY: You may cross-examine. MR. TOP: No questions. MR. MILLS: No cross-examination."

In telling her story, the prosecuting witness had fixed the time of her seizure by stating that she left the hospital at eight-thirty and that it took her, perhaps, fifteen minutes to reach the postoffice. She had also testified that she left one package of Kleenex at the hospital and kept another in her car, and that one of the defendants brought some of this material into the shack and made use of it. Some of this crumpled-up material was found there by the police, and was later subjected to chemical analysis, with the result hereinbefore indicated. It would seem, therefore, that this testimony was admissible as corroborative of the prosecuting witness.

It is vigorously insisted that the evidence concerning the illness of the prosecuting witness, and that of her husband, was wholly irrelevant, and that it may

have aroused great sympathy for the prosecuting witness in the minds and hearts of the jury, that was naturally transmuted into indignation against the defendants, and may account for the fact that the jury imposed the death penalty upon the appellant; hence, we are urged to set aside the judgment and sentence of the court and grant him a new trial.

We may say, parenthetically, that, if the evidence complained of be wholly disregarded, it would seem that the other evidence in the case, and against the reception of which no complaint is made, and particularly that describing Marable's treatment of the prosecuting witness in the abandoned shack, would of itself arouse all of the sympathy that the human heart is capable of feeling. But however that may be, the evidence complained of was relevant. In the case of *People v. Marrs,* 125 Mich. 376, 84 N. W. 284, the court said:

"It was competent for the prosecution to show the mental and physical condition of the prosecutrix, as bearing upon the extent of the resistance the law required her to make."

See, also, *State v. Knapp,* 45 N. H. 148; *Thompson v. State,* 44 Neb. 366, 62 N. W. 1060; *State v. Carpenter,* 124 Iowa 5, 98 N. W. 775; *People v. Ayres,* 195 Mich. 274, 161 N. W. 870.

After all, whether or not evidence is relevant, is wholly a matter of logic and reason. It is logical and reasonable to infer that a woman's courage and will to resist may be impaired by such circumstances as recent childbirth, an attack of "flu," and worry and anxiety over the critical condition of her husband. This being so, we are of the opinion that the evidence complained of was relevant.

The judgment and sentence appealed from is affirmed.

BLAKE, C. J., BEALS, SIMPSON, and MILLARD, JJ., concur.